# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Michael A. Hammer |
| | : | |
| v. | : | Mag. No. 24-10187 |
| | : | |
| MICHAEL SAWYER and | : | |
| LATRONIA SANDERS | : | **CRIMINAL COMPLAINT** |
| a/k/a "Tee" | : | |

I, Mark Brzyzek, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation and that this complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

/s/ Mark Brzyzek, Special Agent
_____
Mark Brzyzek, Special Agent
Federal Bureau of Investigation

Special Agent Mark Brzyzek attested to this Affidavit by telephone pursuant to F.R.C.P. 4.1(B)(2)(A) on this 2nd day of October, 2024.

/s/ Hon. Michael A. Hammer
_____
Hon. Michael A. Hammer
United States Magistrate Judge

## ATTACHMENT A

### Count 1
### (Conspiracy to Defraud Facilitated by the Use of Interstate Wire Transmissions)

From in or about January 2020 through in or about January 2022, in Essex County, in the District of New Jersey and elsewhere, defendants

**MICHAEL SAWYER and
LATRONIA SANDERS
a/k/a "Tee,"**

knowingly and intentionally conspired and agreed with each other and others to devise a scheme and artifice to defraud the City of Newark, New Jersey, and to obtain money and property by means of materially fraudulent pretenses, representations, and promises, and for the purpose of executing and attempting to execute such scheme and artifice, did transmit and cause to be transmitted, by means of wire communications in interstate commerce and foreign commerce, certain writings, signs, signals, pictures, and sounds, contrary to Title 18, United States Code, Section 1343.

In violation of Title 18, United States Code, Section 1349.

## ATTACHMENT B

I, Mark Brzyzek, am a Special Agent of the Federal Bureau of Investigation. The information contained in this complaint is based upon my personal knowledge, as well as information obtained from other sources, including: (a) statements made or reported by various witnesses with knowledge of relevant facts; (b) my review of publicly available information; and (c) my review of evidence, including photographs, videos, business records, bank records, and other documents. Because this complaint is being submitted for a limited purpose, I have not set forth every fact that I know concerning this investigation. Where the contents of documents and the actions and statements of others are reported, they are reported in substance and in part, except where otherwise indicated. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged. Any dollar amounts and times referenced in this complaint are approximate.

## RELEVANT INDIVIDUALS AND ENTITIES

1. At all times relevant to this criminal complaint:

    a. JAS Group Enterprise, Inc. ("JAS") was a construction company based in Burlington, New Jersey, that was hired by the City of Newark, New Jersey ("Newark"), as a contractor, in or about December 2020, to replace lead pipes in water service lines as part of Newark's Lead Service Line Replacement Program (the "LSLR Program"). Prior to being hired as a contractor, JAS worked on the LSLR Program as a subcontractor for another construction company (the "Construction Company"), described further below.

    b. Defendant SAWYER, a resident of Burlington County, New Jersey, was the President and Chief Executive Officer of JAS and was responsible for overseeing and managing JAS's operations.

    c. Defendant SANDERS, a resident of Union County, New Jersey, was employed by JAS as a foreperson of JAS crews assigned to replace lead pipes in Newark, New Jersey, during the LSLR Program. As foreperson, SANDERS managed crew members, communicated with JAS administrative personnel, and interacted with third parties with oversight responsibilities during the LSLR Program, among other things.

    d. "Co-Conspirator 1" was employed by JAS as a foreperson of JAS crews during the LSLR Program.

    e. The Construction Company, based in Newark, New Jersey, was one of the companies hired by Newark to replace lead pipes in water

2

      service lines as part of the LSLR Program. The Construction Company, in turn, hired various subcontractors, including JAS, to perform some of the lead service line replacement work it was assigned by Newark.

    f. The "Engineering Firm," headquartered in Boston, Massachusetts, was retained by Newark as the project manager for the LSLR Program. The Engineering Firm was responsible for coordinating water service line replacements on behalf of Newark, inspecting work performed by LSLR Program contractors, and tracking and sharing the LSLR Program's progress with Newark and other stakeholders. The Engineering Firm employed inspectors who were tasked with verifying that the water service line replacement at each site was completed properly and documenting the work by contractors and subcontractors in an inspection report.

## **OVERVIEW OF THE CONSPIRACY**

2. SAWYER, SANDERS, and others conspired to defraud Newark and others in connection with JAS's performance as a contractor and as a subcontractor during the LSLR Program. Specifically, SAWYER, SANDERS, and others intentionally failed to replace all lead pipes at certain locations as required under the terms of the relevant contracts, yet submitted or caused to be submitted applications for payment to Newark falsely representing that JAS completed the work in accordance with the contracts. SAWYER, SANDERS, and others omitted material information from their payment applications and supporting materials—namely, that they intentionally failed to replace all lead pipes at certain locations—that would have caused Newark to deny payment.

3. SAWYER, SANDERS, and others submitted false and/or misleading documents to support payment applications with respect to certain work sites. These materials included photographs that visually represented that the replacement was done or was unnecessary, but in fact were taken in a way to conceal that lead pipes were left in place.

4. At other sites where the water service lines already consisted entirely of copper pipes, SAWYER, SANDERS, and others falsely represented that JAS had installed those copper pipes after removing lead pipes. SAWYER, SANDERS, and others then submitted or caused to be submitted fraudulent payment applications for work that JAS never completed, and thereby induced Newark to pay JAS for work that JAS did not perform.

# BACKGROUND

<u>The Newark LSLR Program</u>

5. Beginning in or about 2016, high levels of lead were found in the drinking water in some of Newark's schools, raising broader concerns about Newark's water supply. From in or about 2017 to in or about 2019, periodic testing by the U.S. Environmental Protection Agency ("EPA") and the New Jersey Department of Environmental Protection of Newark's drinking water showed lead levels that were among the highest of any major city in the United States, exceeding 15 parts per billion, the level of lead above which the EPA requires that remedial action be taken. According to the EPA, any amount of lead exposure—even at levels below the federal actionable standard of 15 parts per billion—is detrimental to health, particularly for children.

6. In coordination with state and federal regulators, Newark implemented various measures to respond to its water crisis. As part of this response, in or about March 2019, Newark announced plans to replace approximately 18,000 lead service lines within city limits with copper pipes as part of the LSLR Program.

7. In or about May 2018, Newark hired the Engineering Firm to oversee the implementation of the LSLR Program. Newark separately entered into general contracting agreements—also referred to as prime contracts—with various construction companies to replace lead service lines. Each prime contract contained a list of addresses, or "sites," selected by Newark, where the prime contractor (the "Prime") was responsible for identifying and replacing any lead pipes present in water service lines.

8. The Construction Company was the Prime for approximately 11 contracts during different phases of the LSLR Program. Prior to serving as a Prime, beginning in or about January 2020, JAS served as a subcontractor for the Construction Company for five of those contracts—Contract 14, Contract 16, Contract 29, Contract 32, and Contract 35.

9. In or about September 2020, JAS submitted and won its own bid to provide general contracting services as a Prime directly to Newark. After winning this bid, in or about December 2020, JAS entered into a prime contract with Newark denominated "Contract 39." The value of Contract 39 was $10,209,870.00 and, pursuant to Contract 39, JAS agreed to complete work at up to 1,500 sites chosen by Newark.

10. The contracts that governed the LSLR Program required contractors to remove **all** lead pipes, as well as galvanized iron and galvanized steel pipes,[1] that were present in water service lines at their assigned sites. For instance, certain prime contracts, including Contract 39, and four of the prime contracts for which JAS served as subcontractor to the Construction Company, stated: "All existing lead or galvanized iron/steel pipe known within the water service line shall be replaced. No partial replacements shall be performed without written permission from the Owner." In other words, if any portion of any water service line contained lead, galvanized iron, or galvanized steel pipes, the crews were contractually required to replace it, and partial replacements were not allowed.[2] Whether as a Prime or as a subcontractor, JAS was required to perform work in accordance with the specifications of the prime contracts, which, as referenced above, required the removal of all lead pipes that were present in water service lines. For example, in connection with Contract 16, the Construction Company provided JAS with written instructions stating, "All services must be installed from start to finish. Subcontractors are not allowed to reconnect existing lead to newly installed copper."

Water Service Line Replacement

11. The required procedure for replacing lead pipes was as follows. When a crew arrived at a particular site designated for possible lead service line replacement, they excavated on the sidewalk in order to access the "curb stop" or the "curb shut off valve" (the "curb stop"). The curb stop connects the section of the water service line that runs toward the water main, usually located under the street, and the section of the water service line that runs toward the water meter, usually located inside the basement of a residence. By excavating at the curb stop, the crew could determine whether either section of the water service line contained lead pipes. The crew was required to excavate a hole at the curb stop that was of sufficient dimensions and depth to determine the existing pipe material.

12. If the excavation revealed any part of the water service line was made of lead, the crew was required to remove it and replace it with copper. Sometimes the entire water service line was lead, in which case the contractor would perform,

---

[1] Because galvanized iron and galvanized steel pipes pose health risks, contractors were required to remove and replace them in addition to lead pipes during the LSLR Program.

[2] Other prime contracts contained similar language requiring replacement of all lead, galvanized iron, and galvanized steel pipes, including the following: "If any portion of the water service line is found to be lead or galvanized iron/steel, said portions shall be replaced in accordance with the details."

and bill for, a "full-service" replacement of the entire line. In some cases, only half of the line (i.e., just the portion of the line between the curb stop and the water main or between the curb stop and the meter) was lead, in which case the contractor would perform, and bill for, a "half-service" replacement.

       13.    If the excavation did not reveal any lead, the contractor would bill for a "test pit" (i.e., the cost of excavating at the curb stop and incidentals). If a contractor billed only for a "test pit," that meant that a water service line consisted entirely of copper.

       14.    Contractors were paid more for full-service replacements than half-service replacements, and more for half-service replacements than test pits.

Payment Process

       15.    To receive payment from Newark, Primes submitted periodic payment applications for the services they performed. The Prime first sent a payment application to the Engineering Firm, which reviewed the application. After determining that the payment application was complete and accurate, the Engineering Firm transmitted the payment application to Newark, accompanied by a letter (a) indicating that the application complied with the contract, based on the Engineering Firm's records and inspection of the work; and (b) recommending that Newark remit payment to the Prime. Based on the Engineering Firm's analysis and recommendation, Newark issued payment to the Prime.

       16.    Each payment application consisted of various components, including photographs of the work completed at each site and a list that indicated the type of service (i.e., full-service replacement, half-service replacement, or test pit) performed at each site. For each site, Primes were also required to submit a "verification form" containing the signatures of the "contractor person-in-charge" and the Engineering Firm inspector assigned to the site. The verification form contained representations concerning, among other things, which part of the water service line, if any, was replaced.

       17.    In addition, each payment application contained a "Certification for Payment" in which a representative of the Prime certified that the work covered by the payment application was completed in accordance with the contract between Newark and the Prime.

       18.    Primes knew that false certifications could subject them to liability and were considered misleading and material. For example, the bid package for Contract 39 required JAS and other companies that submitted bids for that contract to sign a "Prompt Payment Certification" that stated the following:

> a. "I understand and acknowledge that if Contractor submits an application for payment without (1) having completed work in

    accordance with the contactor documents, (2) payment requested being due . . . . then Contractor has submitted a false claim and false certification, subjecting Contractor to liability, damages and penalties under the New Jersey False Claims Act, N.J.S.A. 2A:32C-1 et seq."

    b. "I further understand and acknowledge that a false certification, whether express or implied that (1) the work covered by an application for payment has been completed in accordance with the contract documents, (2) the payment requested is due . . . is misleading with respect to the goods and services Contractor is providing."

    c. "I also understand and acknowledge that the requirements that (1) work has been completed in accordance with the contract documents, (2) the payment requested is due . . . are material to the State's decision to allocate State funding dollars for this contract, and also material to any local government entity's decision to retain and make payment to the contractor."

    19.    SAWYER signed the Prompt Payment Certification associated with Contract 39 on behalf of JAS.

    20.    In accordance with this process, JAS, as the Prime for Contract 39, submitted various payment applications to the Engineering Firm, which then reviewed and submitted the applications to Newark and recommended that Newark pay JAS. Based on those recommendations, Newark approved and remitted payments directly to JAS.

    21.    The Construction Company, as the Prime for Contract 14, Contract 16, Contract 29, Contract 32, and Contract 35, also submitted payment applications to the Engineering Firm and Newark in accordance with the above-described process. In submitting payment applications for work that included sites completed by JAS as a subcontractor, the Construction Company relied on documentation and representations made by JAS regarding the type of service purportedly performed at each site. For instance, JAS personnel—including an employee who was tasked with administrative responsibilities in JAS's office ("Employee 1")—sent the Construction Company a "Daily Production" email that summarized the addresses completed by JAS and the types of services performed at each address on a given day. The information contained in the "Daily Production" emails was based on representations made by JAS personnel in the field, including SANDERS, to JAS administrative personnel, including Employee 1.

    22.    In addition to the "Daily Production" emails, JAS submitted verification forms, photographs, and other supporting documentation to the

7

Construction Company. The Construction Company was required to include such documentation in its payment applications in order for the Engineering Firm to recommend payment and for Newark to remit payment. Relying on the information and documentation provided by JAS, the Construction Company included requests for payment for the services JAS represented it had completed in its payment applications to Newark. After Newark paid the Construction Company, the Construction Company paid JAS for JAS's work as a subcontractor.

23. If the Engineering Firm had learned through inspectors or otherwise that JAS failed to replace all lead pipes at a site, as required by the contracts, the Engineering Firm would not have recommended that Newark release payment for that site or any sites contained in the same payment application. Similarly, Newark would not have released payment for an application that contained a site where JAS failed to replace all lead pipes. Further, if Newark had learned that JAS knowingly left lead in a water service line that should have been remediated, JAS would have been subject to possible termination as a Prime pursuant to the terms of the contract.

## THE SCHEME TO DEFRAUD

24. SANDERS was a JAS foreperson both during the time period that JAS served as a Prime and while it served as a subcontractor for the Construction Company. SAWYER closely managed JAS's operations throughout the LSLR Program, and among other responsibilities, signed each Certification for Payment included in JAS's applications for payment from Newark. SAWYER and SANDERS conspired with each other and with others to defraud Newark by (a) failing to replace all lead pipes as required but intentionally certifying (or causing the Construction Company to falsely certify) that the work had been done in accordance with the contract, and (b) billing Newark and causing payment to be issued for work that was not completed.

Billing for Work Not Performed in Accordance with the Contract

25. As a foreperson of JAS crews during the LSLR Program, SANDERS knew that JAS was required to replace all lead pipes. Similarly, SAWYER—as the signatory of JAS's subcontracts with the Construction Company and Contract 39 with Newark, which unambiguously required the removal of all lead pipes— understood that JAS was required to remove all lead pipes. Nevertheless, on multiple occasions and at multiple sites, SAWYER and SANDERS expressly directed workers not to replace lead pipes that they knew were present in water service lines.

26. For example:

   a. A witness ("Witness 1") recalled multiple instances when crew members explicitly told SANDERS there was lead in the water service line after digging, but SANDERS instructed the crew not to replace the lead. Witness 1 identified to law enforcement two specific addresses where SANDERS directed her crew not to replace lead pipes—one at Badger Avenue (the "Badger Avenue Location") and another on Hawthorne Avenue (the "Hawthorne Avenue Location") in Newark. As detailed in paragraph 29, recent excavations conducted by Newark revealed lead pipes were left at both addresses, consistent with the information provided by Witness 1.

   b. Another witness ("Witness 2") recalled at least two instances when crew members explicitly told SANDERS there was lead in the water service line after digging, but SANDERS instructed the crew not to replace the lead. According to Witness 2, in one of those instances, the Engineering Firm's inspector arrived on scene, directed the crew to dig a wider hole at the curb stop to personally confirm that lead pipes were not present, observed the lead pipe, and ordered the crew to replace the lead pipe.

   c. A third witness ("Witness 3") recalled that SANDERS, on multiple occasions, directed crew members either to replace only a portion of a lead water service line or to leave lead pipes in water service lines undisturbed.

   d. Two additional witnesses ("Witness 4" and "Witness 5") recalled that SAWYER occasionally made field visits and, at certain work sites, expressly directed them not to replace lead pipes and to conceal them with dirt.

27. Since in or about January 2024, Newark has excavated and inspected water service lines at various sites that were assigned to JAS for remediation during the LSLR Program. To date, Newark has discovered remaining lead pipes at approximately 28 of those sites.[3] SANDERS was the foreperson at approximately 14 of those sites, while the remainder were assigned to other JAS forepersons, including Co-Conspirator 1.

28. For these sites, JAS sought payment even though it concealed from the Engineering Firm and Newark that it did not complete the work as required by the

---

[3] Upon discovering the lead pipes, Newark removed and replaced them with copper pipes.

9

contracts. As detailed below, at some of these sites, JAS replaced half of the water service line containing lead but did not, as required, replace the other half containing lead. Nonetheless, JAS sought and received payment for a half-service replacement, necessarily representing or causing a representation that all lead had been removed. At other sites where JAS found lead, JAS billed or caused the billing of these sites as test pits, thereby representing to Newark that the water service lines consisted entirely of copper.

29.  The chart below describes the 14 sites where SANDERS was foreperson and remaining lead was found, the type of service JAS or the Construction Company billed Newark for payment, and the type of service that should have been performed in order for the work to have been done in accordance with the contract terms.[4]

| Date | Address[5] | Prime or Subcontract (Contract No.) | Service Fraudulently Billed | Service that Should Have Been Performed Per the Contract |
|---|---|---|---|---|
| 1/15/21 | Badger Avenue Location | Subcontract (Contract 29) | Half-Service Replacement from Curb Stop to Meter | Full-Service Replacement |
| 1/6/21 | Hawthorne Avenue Location | Subcontract (Contract 32) | Test Pit | Half-Service Replacement from Curb Stop to Water Main |
| 3/22/21 | Avon Avenue Location | Prime (Contract 39) | Test Pit | Half-Service Replacement from Curb Stop to Water Main |

---

[4] Newark also discovered galvanized steel pipes at two JAS sites, including one where SANDERS was the foreperson. Newark removed and replaced those pipes with copper.

[5] The addresses listed here are referenced by the name of the street on which each site was located.

10

| 2/17/21 | N 13th Street Location | Prime (Contract 39) | Half-Service Replacement from Curb Stop to Meter | Full-Service Replacement |
|---|---|---|---|---|
| 12/10/20 | N 11th Street Location 1 | Subcontract (Contract 32) | Test Pit | Full-Service[6] Replacement |
| 12/10/20 | N 11th Street Location 2 | Subcontract (Contract 32) | Test Pit | Half-Service Replacement from Curb Stop to Water Main |
| 10/21/20 | Chapman Street Location 1 | Subcontract (Contract 35) | Half-Service Replacement from Curb Stop to Meter | Full-Service Replacement |
| 10/13/20 | Chapman Street Location 2 | Subcontract (Contract 35) | Test Pit | Half-Service Replacement from Curb Stop to Water Main |
| 12/29/20 | Bergen Street Location 1 | Subcontract (Contract 32) | Test Pit | Half-Service Replacement from Curb Stop to Water Main |
| 12/29/20 | Bergen Street Location 2 | Subcontract (Contract 32) | Test Pit | Half-Service Replacement from Curb Stop to Water Main |
| 12/30/20 | Bergen Street Location 3 | Subcontract (Contract 32) | Test Pit | Half-Service Replacement from Curb Stop to Water Main |

---

[6] The water service line was comprised of a brass pipe from the curb stop to the meter and a lead pipe from the curb stop to the water main. Under the terms of Contract 32, brass pipes were also supposed to be removed and replaced. JAS did not replace either. Newark has since replaced the entire water service line.

11

| 12/15/20 | Bergen Street Location 4 | Subcontract (Contract 32) | Test Pit | Half-Service Replacement from Curb Stop to Water Main |
| --- | --- | --- | --- | --- |
| 1/19/21 | Bergen Street Location 5 | Subcontract (Contract 29) | Test Pit | Half-Service Replacement from Curb Stop to Water Main |
| 6/30/21 | Vassar Avenue Location | Prime (Contract 39) | Test Pit | Half-Service Replacement from Curb Stop to Water Main |

30. SAWYER and SANDERS obtained payment for these sites by taking various steps to conceal their failure to replace lead pipes. These steps included transmitting (a) false or misleading text messages, (b) false or misleading photographs, and (c) misleading verification forms. At times, the Engineering Firm's inspectors relied on photographs of the site transmitted by JAS employees or representations made by JAS employees to verify that the work was properly completed.

31. For example, the day after SANDERS's crew, at her direction, did not replace all lead pipes at Chapman Street Location 2, SANDERS texted the Engineering Firm inspector, "[address for Chapman Street Location 2] test pit." By describing a certain site only as a "test pit," SANDERS was representing to the inspector that the water service line consisted entirely of copper (i.e., that lead pipes were not present) and thus no work other than a test pit was required. SANDERS also sent the inspector a photograph of the purported test pit at Chapman Street Location 2. That photograph excluded the portion of the water service line containing lead.

32. The day after her crew did not replace all lead pipes at the Avon Avenue Location, SANDERS texted the inspector, "[address for the Avon Avenue Location] Test Pit," representing that JAS did not find lead at the site and thus only a test pit was required. Contrary to that representation, there was a lead pipe in the water service line.

33. Further, a review of payment applications submitted by JAS to Newark—as well as those JAS sent to the Construction Company to be used in its payment applications to Newark—shows that for a number of sites where JAS deliberately failed to remove all lead as required, JAS submitted photographs that

12

concealed lead was not replaced. Some photographs depicted narrowly-dug holes at the curb stop, revealing only a short length of pipe that was copper while not revealing the part that was found by law enforcement to be lead in recent excavations. In other photographs, a substantial portion of the pipes was covered in dirt or mud. Other photographs were blurry and low quality, making it impossible to see the remaining lead pipe.

34. For example, the photographs JAS submitted in support of its payment application for the Avon Avenue Location depicted a very small portion of the water service line that did not match how the water service line looked during recent excavations. For Bergen Street Location 2, the photograph JAS submitted in support of payment showed loose dirt covering the portion of the water service line that indicated the presence of lead.

35. Former members of SANDERS's crew, including Witnesses 1, 2, 3, 4, and 5, stated that, on multiple occasions when Engineering Firm inspectors were not physically present at sites, SANDERS submitted photographs to the inspectors that concealed the fact that lead pipes remained in the ground.

36. JAS also concealed that it did not replace lead by submitting verification forms that omitted the material fact that, contrary to the terms of the contract, JAS did not remove all lead pipes at each of these locations.

37. The verification forms for the Avon Avenue Location and Bergen Street Location 5, which contained signatures for SANDERS, indicated that the water service lines did not need to be replaced, even though SANDERS knew that the lines contained lead pipes from the water main to the curb stop. For instance, the verification form for Bergen Street Location 5 asked, "Was Water Service from Water Main to Curb Stop Replaced" and "Was Water Service from Curb Stop to Water Meter Replaced." The form, which contained a signature for SANDERS, stated "N/A" in response to both questions, falsely representing that no replacement was necessary. As to the Avon Avenue Location, SANDERS answered "No" to these same questions.

38. The verification form for the N 13th Street Location was similarly misleading. JAS should have performed a full-service replacement but only replaced the lead from the curb to the meter. The verification form, which contained a signature for SANDERS, stated that JAS replaced the line from the curb to the meter, but in response to whether JAS replaced the line from the water main to the curb, the form stated only "no," omitting the material fact that lead was present and needed to be replaced.

39. SANDERS knew that these verification forms would be submitted in support of payment applications under the contracts to Newark.

13

40. JAS worked on the Avon Avenue Location, the N 13th Street Location, and the Vassar Avenue Location (all sites where lead pipes in the water service lines were found in recent excavations) as a Prime pursuant to Contract 39. In seeking payment from Newark for these three sites, SAWYER submitted verification forms directly to the Engineering Firm and Newark that omitted the material fact that, contrary to the terms of the contract, JAS did not remove all lead pipes at each of these locations. Two of these verification forms submitted under Contract 39 (i.e., the Avon Avenue Location and the N 13th Street Location) contained signatures for SANDERS.

41. Further, in the payment applications for these three addresses under Contract 39 where SANDERS failed to replace all lead pipes, SAWYER falsely represented to Newark that "the work covered by [the] application for payment has been completed in accordance with the contract documents . . . ."

42. With respect to the remaining sites referenced in paragraph 29, JAS acted as a subcontractor for the Construction Company. In that capacity, SAWYER, SANDERS, and others submitted or caused to be submitted, among other things, various verifications to the Construction Company, including via "Daily Production" emails, describing the work purportedly performed as required by the contracts at each site. For example, SANDERS communicated via text message to Employee 1 that only a "test pit" was completed at Bergen Street Location 5, and Employee 1 subsequently shared that information with the Construction Company, thereby conveying to the Construction Company that no more work was required because the water service line consisted entirely of copper, with no lead to remove.[7] Similarly, SANDERS communicated via text message to Employee 1 that a half-service replacement was completed at the Badger Avenue Location, and Employee 1 subsequently shared that information with the Construction Company, thereby conveying to the Construction Company that no more work was required because the portion of the water service line that was not replaced consisted of copper. As shown in paragraph 29, those representations were misleading in that they omitted material facts about the work that should have been performed.

Billing for Services Never Rendered

43. At multiple sites, SAWYER, SANDERS, and Co-Conspirator 1 falsely represented to Engineering Firm inspectors, and ultimately to Newark, that JAS had replaced lead pipes with copper pipes, despite knowing that the entire water service line already consisted of copper prior to JAS's involvement at the site and that JAS did not make the replacements they falsely claimed to have completed.

---

[7] During Contract 39, SANDERS sent similar text messages with respect to the Vassar Avenue Location and the Avon Avenue Location, causing JAS to include purported services at those locations in payment applications.

14

44.     According to witnesses, SAWYER, SANDERS, and Co-Conspirator 1 instructed crews to clean and shine existing copper pipes to make them appear new. Witness 1 recalled that Co-Conspirator 1 provided the crew with materials to clean and shine existing copper pipes to make them appear as if they were newly installed by JAS. Witness 1 estimated that Co-Conspirator 1 gave similar instructions at approximately 200 to 300 sites during the LSLR Program.

45.     On or about August 19, 2021, JAS purportedly completed work at a location on Clifton Avenue in Newark (the "Clifton Avenue Location"), pursuant to Contract 39. In or about March 2024, with law enforcement present, Newark excavated the water service line at the Clifton Avenue Location. Law enforcement's examination revealed that although the entire water service line now consists of copper, JAS had only replaced the water service line from the curb stop to the meter (a half-service replacement). The copper pipe from the curb stop to the water main predated JAS's work at the site, where SANDERS served as foreperson.

46.     Nonetheless, records reflect that, on or about December 20, 2021, JAS submitted a payment application to the Engineering Firm that included a fraudulent request for payment for a full-service replacement at the Clifton Avenue Location when JAS should have only billed for a half-service replacement. This payment application included a false verification form containing a signature for SANDERS and a false certification signed by SAWYER.

47.     On or about December 22, 2021, the Engineering Firm transmitted that payment application to Newark and recommended payment by Newark to JAS for a full-service replacement. The Engineering Firm also submitted to Newark JAS's documentation in support of the payment application. On or about January 24, 2022, Newark issued payment to JAS for the payment application containing the Clifton Avenue Location.

48.     Text messages between SAWYER and SANDERS concerning the Clifton Avenue Location showed that SAWYER and SANDERS conspired to fraudulently represent that JAS made a full-service replacement at that location and that SANDERS took affirmative steps to conceal that fraud.

49.     Specifically, on or about August 19, 2021, at approximately 2:42 p.m., SANDERS sent a text message to JAS employees indicating the address of the Clifton Avenue Location. The message appeared to show SANDERS telling her crew they would be working on that address on August 19, 2021. At approximately 5:26 p.m., SANDERS sent a text message to SAWYER stating, "I don't mine[sic] making it a full but sometimes these things come back." SANDERS then sent a photograph of the "mark-out" on the street, stating "That's the street." SAWYER responded, "Ok." The mark-out was made with blue paint. A "mark-out" indicates

15

the location of the water main; if JAS were to perform a full-service replacement, it would have to dig at this location.

50. SANDERS later texted SAWYER, "I'm going to dig the asphalt for a pic it has blue paint on it." Based on the investigation to date, I believe that SANDERS was indicating to SAWYER that she was going to dig at the "mark-out" to make it appear credible that a full-service replacement had been completed. Indeed, various witnesses stated that on multiple occasions, they were instructed to dig into asphalt in order to give the appearance that replacements had been made when in fact they had not been.

51. During this exchange, SANDERS also sent a photograph to SAWYER of what appeared to be the curb shut off valve at the Clifton Avenue Location. This photograph showed an obsolete type of curb shut off valve, inconsistent with having completed a full-service replacement. The documentation that JAS submitted to the Engineering Firm, however, contained a different photograph that depicted a modern curb shut off valve with modern compression fittings on both sides of the curb shut off valve. When the site was excavated in March 2024, law enforcement found that there was no modern curb shut off valve and no modern compression fittings. Accordingly, a review of the records concerning the Clifton Avenue Location show that JAS fraudulently submitted photographs that made it appear that JAS had completed the work for which it billed.

52. Other text communications between SAWYER and Employee 1, relating to a location on North 9th Street (the "North 9th Street Location"), indicate that SAWYER considered seeking payment for a full-service replacement he knew JAS did not complete and reversed course only upon realizing that his decision to do so would likely be discovered by the Engineering Firm. On or about September 16, 2021, SAWYER and Employee 1 had the following text exchange:

SAWYER: [North 9th Street Location] is NOT in the line app[8] as a full.

Employee 1: We can remove it as nothing done. Once I read the comments it was back filled due to no access

SAWYER: Huh [emoji]?

SAWYER: You most (sic) be sleepy

SAWYER: lol

---

[8] Based on my knowledge of the investigation, I believe "line app" referred to a record-keeping application that JAS used in submitting supporting documentation to the Engineering Firm and Newark in connection with payment.

Employee 1: E builder[9] said it was a full service BUT work wasn't completed homeowner wasn't home even though I'm sleepy lol

SAWYER: lol

SAWYER: So why would E builder say it was a full?

SAWYER: Can we find pictures to put in the line app?

SAWYER: That way we can bill it

Employee 1: [screenshot of Engineering Firm website containing notes from Engineering Firm inspector indicating that while a full-service replacement was required, the homeowner was not present and the work was not completed]

SAWYER: I guess we can't bill it

[end of conversation]

53.     Other text communications between SAWYER and a different JAS employee ("Employee 2"), relating to a site on Fabyan Place (the "Fabyan Place Location"), further reveal SAWYER's intent to bill for work that he knew JAS did not perform. Specifically, on or about October 19, 2020, Employee 2 sent the Construction Company a "Daily Production" email indicating that a half-service replacement was completed at the Fabyan Place Location. The Construction Company subsequently included that half-service replacement in a draft payment application submitted to the Engineering Firm. On or about December 9, 2020, the Engineering Firm instructed the Construction Company to remove the Fabyan Place Location from the payment application because the Construction Company had failed to submit photographs verifying the work that was purportedly done at the site. The Construction Company repeatedly requested that SAWYER send photographs of the half-service replacement at the Fabyan Place Location, which SAWYER failed to do.

54.     On or about December 18, 2020, Employee 2 alerted SAWYER that a half-service replacement was not actually completed at the Fabyan Place Location, in the following text exchange:

---

[9] Based on my knowledge of the investigation, I believe "E builder" referred to an electronic database used during the LSLR Program to maintain and submit information and documents, including inspection reports.

17

Employee 2: Mike [Fabyan Place Location] is a test pit boss. Just realized I had a picture of on my phone.

SAWYER: Can we make something up?
Employee 2: Wat do you mean?

[end of conversation]

55. The Engineering Firm ultimately denied payment for the Fabyan Place Location due to the missing photographs.

### THE USE OF INTERSTATE WIRE TRANSMISSIONS IN FURTHERANCE OF THE CONSPIRACY TO DEFRAUD

56. On or about the dates listed below, in Essex County, in the District of New Jersey, and elsewhere, for the purpose of executing and attempting to execute the scheme and artifice to defraud, SAWYER, SANDERS, and others knowingly and intentionally transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate commerce, certain writings, signs, signals, pictures, and sounds, to include:

| Approximate Date | Description of Interstate Wire Transmission |
| --- | --- |
| December 20, 2021 | Email, transmitted through a server outside of New Jersey via the Internet, from JAS to the Engineering Firm attaching its payment application for approximately $1,760.676.24, which included a fraudulent request for JAS to be paid for a full-service replacement at the Clifton Avenue Location. |
| January 7, 2021 | Email, transmitted through a server outside of New Jersey via the Internet, from JAS to the Construction Company submitting a verification form for the Hawthorne Avenue Location, omitting the material fact that all lead pipes were not replaced as required by the governing contract. |
| April 21, 2021 | Deposit into JAS bank account of a check for approximately $199,687.12 from the Construction Company that included payment for a test pit at the Hawthorne Avenue Location. This transaction involved the use of a server located outside New Jersey. |

| | |
|---|---|
| January 18, 2021 | E-mail, transmitted through a server outside of New Jersey via the Internet, from JAS to the Construction Company stating that JAS replaced the pipes from the curb stop to the meter at the Badger Avenue Location, omitting the material fact that lead pipes were not replaced from the curb stop to the water main as required by the governing contract. |
| April 8, 2021 | Deposit into JAS bank account of a check for approximately $85,494.27 from the Construction Company that included payment for a half-service replacement at the Badger Avenue Location. This transaction involved the use of a server located outside New Jersey. |