2023R00772/ER/MHS

**FILED**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

OCT 0 8 2025

AT 8:30 4:00pm
CLERK, U.S. DISTRICT COURT - DNJ

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Karen M. Williams |
| | : | |
| v. | : | Crim. No. 25-619 |
| | : | |
| MICHAEL SAWYER and | : | 18 U.S.C. § 1349 |
| LATRONIA SANDERS | : | |
| a/k/a "Tee" | : | |

## I N D I C T M E N T

The Grand Jury in and for the District of New Jersey, sitting at Newark, charges as follows:

### (Conspiracy to Defraud Facilitated by the Use of Interstate Wire Transmissions)

### RELEVANT INDIVIDUALS AND ENTITIES

1.    At all times relevant to this Indictment:

a.    JAS Group Enterprise, Inc. ("JAS") was a construction company based in Burlington, New Jersey, that was hired by the City of Newark, New Jersey ("Newark"), as a contractor, in or about December 2020, to replace lead pipes in water service lines as part of Newark's Lead Service Line Replacement Program (the "LSLR Program"). Prior to being hired as a contractor, JAS worked on the LSLR Program as a subcontractor for another construction company (the "Construction Company"), described further below.

b.    Defendant SAWYER, a resident of Burlington County, New Jersey, was the President and Chief Executive Officer of JAS and was responsible for overseeing and managing JAS's operations.

1

c.      Defendant SANDERS, a resident of Union County, New Jersey, was employed by JAS as a foreperson of JAS crews assigned to replace lead pipes in Newark, New Jersey, during the LSLR Program.  As foreperson, SANDERS managed crew members, communicated with JAS administrative personnel, and interacted with third parties with oversight responsibilities during the LSLR Program, among other things.

d.      "Co-Conspirator 1" was employed by JAS as a foreperson of JAS crews during the LSLR Program.

e.      The Construction Company, based in Newark, New Jersey, was one of the companies hired by Newark to replace lead pipes in water service lines as part of the LSLR Program.  The Construction Company, in turn, hired various subcontractors, including JAS, to perform some of the lead service line replacement work it was assigned by Newark.

f.      The "Engineering Firm," headquartered in Boston, Massachusetts, was retained by Newark as the project manager for the LSLR Program. The Engineering Firm was responsible for coordinating water service line replacements on behalf of Newark, inspecting work performed by LSLR Program contractors, and tracking and sharing the LSLR Program's progress with Newark and other stakeholders. The Engineering Firm employed inspectors who were tasked with verifying that the water service line replacement at each site was completed properly and documenting the work by contractors and subcontractors in an inspection report.

## OVERVIEW OF THE CONSPIRACY

2.    SAWYER, SANDERS, and others conspired to defraud Newark and others in connection with JAS's performance as a contractor and as a subcontractor during the LSLR Program.    Specifically, SAWYER, SANDERS, and others intentionally failed to replace all lead pipes at certain locations as required under the terms of the relevant contracts, yet submitted or caused to be submitted applications for payment to Newark falsely representing that JAS completed the work in accordance with the contracts.    SAWYER, SANDERS, and others omitted material information from their payment applications and supporting materials—namely, that they intentionally failed to replace all lead pipes at certain locations—that would have caused Newark to deny payment.

3.    SAWYER, SANDERS, and others submitted false and/or misleading documents to support payment applications with respect to certain work sites.    These materials included photographs that visually represented that the replacement was done or was unnecessary, but in fact were taken in a way to conceal that lead pipes were left in place.

4.    At other sites where the water service lines already consisted entirely of copper pipes, SAWYER, SANDERS, and others falsely represented that JAS had installed those copper pipes after removing lead pipes.    SAWYER, SANDERS, and others then submitted or caused to be submitted fraudulent payment applications for work that JAS never completed, and thereby induced Newark to pay JAS for work that JAS did not perform.

3

## THE CONSPIRACY

5.     From in or about January 2020 through in or about January 2022, in Essex County, in the District of New Jersey and elsewhere, defendants

### MICHAEL SAWYER and
### LATRONIA SANDERS
### a/k/a "Tee,"

knowingly and intentionally conspired and agreed with each other and others to devise a scheme and artifice to defraud the City of Newark, New Jersey, and to obtain money and property by means of materially fraudulent pretenses, representations, and promises, and for the purpose of executing and attempting to execute such scheme and artifice, did transmit and cause to be transmitted, by means of wire communications in interstate commerce and foreign commerce, certain writings, signs, signals, pictures, and sounds, contrary to Title 18, United States Code, Section 1343.

## RELEVANT BACKGROUND

The Newark LSLR Program

6.     In or about March 2019, Newark announced plans to replace approximately 18,000 lead service lines within city limits with copper pipes as part of the LSLR Program. In or about May 2018, Newark hired the Engineering Firm to oversee the implementation of the LSLR Program. Newark separately entered into general contracting agreements—also referred to as prime contracts—with various construction companies to replace lead service lines. Each prime contract contained a list of addresses, or "sites," selected by Newark, where the prime contractor (the

4

"Prime") was responsible for identifying and replacing any lead pipes present in water service lines.

7.     The Construction Company was the Prime for approximately 11 contracts during different phases of the LSLR Program. Prior to serving as a Prime, beginning in or about January 2020, JAS served as a subcontractor for the Construction Company for five of those contracts—Contract 14, Contract 16, Contract 29, Contract 32, and Contract 35.

8.     In or about September 2020, JAS submitted and won its own bid to provide general contracting services as a Prime directly to Newark. After winning this bid, in or about December 2020, JAS entered into a prime contract with Newark denominated "Contract 39." The value of Contract 39 was $10,209,870.00 and, pursuant to Contract 39, JAS agreed to complete work at up to 1,500 sites chosen by Newark.

9.     The contracts that governed the LSLR Program required contractors to remove **all** lead pipes that were present in water service lines at their assigned sites. For instance, certain prime contracts, including Contract 39, and four of the prime contracts for which JAS served as subcontractor to the Construction Company, stated: "All existing lead or galvanized iron/steel pipe known within the water service line shall be replaced. No partial replacements shall be performed without written permission from the Owner." In other words, if any portion of any water service line contained lead, galvanized iron, or galvanized steel pipes, the crews were contractually required to replace it, and partial replacements were not allowed.

Whether as a Prime or as a subcontractor, JAS was required to perform work in accordance with the specifications of the prime contracts, which, as referenced above, required the removal of all lead pipes that were present in water service lines. For example, in connection with Contract 16, the Construction Company provided JAS with written instructions stating, "All services must be installed from start to finish. Subcontractors are not allowed to reconnect existing lead to newly installed copper."

Water Service Line Replacement

10. The required procedure for replacing lead pipes was as follows. When a crew arrived at a particular site designated for possible lead service line replacement, they excavated on the sidewalk in order to access the "curb stop" or the "curb shut off valve" (the "curb stop"). The curb stop connects the section of the water service line that runs toward the water main, usually located under the street, and the section of the water service line that runs toward the water meter, usually located inside the basement of a residence. By excavating at the curb stop, the crew could determine whether either section of the water service line contained lead pipes. The crew was required to excavate a hole at the curb stop that was of sufficient dimensions and depth to determine the existing pipe material.

11. If the excavation revealed any part of the water service line was made of lead, the crew was required to remove it and replace it with copper. Sometimes the entire water service line was lead, in which case the contractor would perform, and bill for, a "full-service" replacement of the entire line. In some cases, only half of the line (i.e., just the portion of the line between the curb stop and the water main or

between the curb stop and the meter) was lead, in which case the contractor would perform, and bill for, a "half-service" replacement.

12.     If the excavation did not reveal any lead, the contractor would bill for a "test pit" (i.e., the cost of excavating at the curb stop and incidentals). If a contractor billed only for a "test pit," that meant that a water service line consisted entirely of copper.

13.     Contractors were paid more for full-service replacements than half-service replacements, and more for half-service replacements than test pits.

Payment Process

14.     To receive payment from Newark, Primes submitted periodic payment applications for the services they performed. The Prime first sent a payment application to the Engineering Firm, which reviewed the application. After determining that the payment application was complete and accurate, the Engineering Firm transmitted the payment application to Newark, accompanied by a letter (a) indicating that the application complied with the contract, based on the Engineering Firm's records and inspection of the work; and (b) recommending that Newark remit payment to the Prime. Based on the Engineering Firm's analysis and recommendation, Newark issued payment to the Prime.

15.     Each payment application consisted of various components, including photographs of the work completed at each site and a list that indicated the type of service (i.e., full-service replacement, half-service replacement, or test pit) performed at each site. For each site, Primes were also required to submit a "verification form"

7

containing the signatures of the "contractor person-in-charge" and the Engineering Firm inspector assigned to the site. The verification form contained representations concerning, among other things, which part of the water service line, if any, was replaced.

16.   In addition, each payment application contained a "Certification for Payment" in which a representative of the Prime certified that the work covered by the payment application was completed in accordance with the contract between Newark and the Prime.

17.   Primes knew that false certifications could subject them to liability and were considered misleading and material. For example, the bid package for Contract 39 required JAS and other companies that submitted bids for that contract to sign a "Prompt Payment Certification" that stated the following:

a.   "I understand and acknowledge that if Contractor submits an application for payment without (1) having completed work in accordance with the contactor documents, (2) payment requested being due . . . . then Contractor has submitted a false claim and false certification, subjecting Contractor to liability, damages and penalties under the New Jersey False Claims Act, N.J.S.A. 2A:32C-1 et seq."

b.   "I further understand and acknowledge that a false certification, whether express or implied that (1) the work covered by an application for payment has been completed in accordance with the contract documents, (2) the payment

requested is due . . . is misleading with respect to the goods and services Contractor is providing."

c.    "I also understand and acknowledge that the requirements that (1) work has been completed in accordance with the contract documents, (2) the payment requested is due . . . are material to the State's decision to allocate State funding dollars for this contract, and also material to any local government entity's decision to retain and make payment to the contractor."

18.    SAWYER signed the Prompt Payment Certification associated with Contract 39 on behalf of JAS.

19.    In accordance with this process, JAS, as the Prime for Contract 39, submitted various payment applications to the Engineering Firm, which then reviewed and submitted the applications to Newark and recommended that Newark pay JAS.    Based on those recommendations, Newark approved and remitted payments directly to JAS.

20.    The Construction Company, as the Prime for Contract 14, Contract 16, Contract 29, Contract 32, and Contract 35, also submitted payment applications to the Engineering Firm and Newark in accordance with the above-described process. In submitting payment applications for work that included sites completed by JAS as a subcontractor, the Construction Company relied on documentation and representations made by JAS regarding the type of service purportedly performed at each site.  For instance, JAS personnel—including an employee who was tasked with administrative responsibilities in JAS's office ("Employee 1")—sent the Construction

Company a "Daily Production" email that summarized the addresses completed by JAS and the types of services performed at each address on a given day. The information contained in the "Daily Production" emails was based on representations made by JAS personnel in the field, including SANDERS, to JAS administrative personnel, including Employee 1.

21.    In addition to the "Daily Production" emails, JAS submitted verification forms, photographs, and other supporting documentation to the Construction Company. The Construction Company was required to include such documentation in its payment applications in order for the Engineering Firm to recommend payment and for Newark to remit payment. Relying on the information and documentation provided by JAS, the Construction Company included requests for payment for the services JAS represented it had completed in its payment applications to Newark. After Newark paid the Construction Company, the Construction Company paid JAS for JAS's work as a subcontractor.

22.    If the Engineering Firm had learned through inspectors or otherwise that JAS failed to replace all lead pipes at a site, as required by the contracts, the Engineering Firm would not have recommended that Newark release payment for that site or any sites contained in the same payment application. Similarly, Newark would not have released payment for an application that contained a site where JAS failed to replace all lead pipes. Further, if Newark had learned that JAS knowingly left lead in a water service line that should have been remediated, JAS would have been subject to possible termination as a Prime pursuant to the terms of the contract.

## GOAL OF THE CONSPIRACY

23.    The goal of the conspiracy was for JAS to obtain payments it was not entitled to receive during the LSLR, as a result of false representations submitted and caused to be submitted by SAWYER and SANDERS to the Construction Company, the Engineering Firm, and Newark.

## MANNER AND MEANS OF THE CONSPIRACY

24.    SANDERS was a JAS foreperson both during the time period that JAS served as a Prime and while it served as a subcontractor for the Construction Company.   SAWYER closely managed JAS's operations throughout the LSLR Program, and among other responsibilities, signed each Certification for Payment included in JAS's applications for payment from Newark.  SAWYER and SANDERS conspired with each other and with others to defraud Newark by (a) failing to replace all lead pipes as required but intentionally certifying (or causing the Construction Company to falsely certify) that the work had been done in accordance with the contract, and (b) billing Newark and causing payment to be issued for work that was not completed.

### Billing for Work Not Performed in Accordance with the Contract

25.    As a foreperson of JAS crews during the LSLR Program, SANDERS knew that JAS was required to replace all lead pipes.  Similarly, SAWYER—as the signatory of JAS's subcontracts with the Construction Company and Contract 39 with Newark, which unambiguously required the removal of all lead pipes—understood that JAS was required to remove all lead pipes in order for JAS to receive payment for their work.  Nevertheless, on multiple occasions and at multiple sites, SAWYER

11

and SANDERS expressly directed workers not to replace lead pipes that they knew were present in water service lines.

26.    For example, multiple witnesses recalled instances when crew members explicitly told SANDERS there was lead in the water service line after digging, but SANDERS instructed the crew not to replace the lead. At least one witness recalled that SAWYER expressly directed employees not to replace lead pipes and/or to conceal lead pipes with dirt.

27.    Since in or about January 2024, Newark has excavated and inspected water service lines at various sites that were assigned to JAS for remediation during the LSLR Program. To date, Newark has discovered remaining lead pipes at approximately 28 of those sites.[1] SANDERS was the foreperson at approximately 14 of those sites, while the remainder were assigned to other JAS forepersons, including Co-Conspirator 1.

28.    For these sites, JAS sought payment even though it concealed from the Engineering Firm and Newark that it did not complete the work as required by the contracts. As detailed below, at some of these sites, JAS replaced half of the water service line containing lead but did not, as required, replace the other half containing lead. Nonetheless, JAS sought and received payment for a half-service replacement, necessarily representing or causing a representation that all lead had been removed. At other sites where JAS found lead, JAS billed or caused the billing of these sites as

---

[1] Upon discovering the lead pipes, Newark removed and replaced them with copper pipes.

test pits, thereby representing to Newark that the water service lines consisted entirely of copper.

29.    The chart below describes the 14 sites where SANDERS was foreperson and remaining lead was found, the type of service JAS or the Construction Company billed Newark for payment, and the type of service that should have been performed in order for the work to have been done in accordance with the contract terms and for JAS to receive any payment for their work.

| Date | Address | Prime or Subcontract (Contract No.) | Service Fraudulently Billed | Service that Should Have Been Performed Per the Contract |
|------|---------|-------------------------------------|------------------------------|----------------------------------------------------------|
| 1/15/21 | Badger Avenue Location | Subcontract (Contract 29) | Half-Service Replacement from Curb Stop to Meter | Full-Service Replacement |
| 1/6/21 | Hawthorne Avenue Location | Subcontract (Contract 32) | Test Pit | Half-Service Replacement from Curb Stop to Water Main |
| 3/22/21 | Avon Avenue Location | Prime (Contract 39) | Test Pit | Half-Service Replacement from Curb Stop to Water Main |
| 2/17/21 | N 13th Street Location | Prime (Contract 39) | Half-Service Replacement from Curb Stop to Meter | Full-Service Replacement |
| 12/10/20 | N 11th Street Location 1 | Subcontract (Contract 32) | Test Pit | Full-Service Replacement |

| 12/10/20 | N 11th Street Location 2 | Subcontract (Contract 32) | Test Pit | Half-Service Replacement from Curb Stop to Water Main |
|---|---|---|---|---|
| 10/21/20 | Chapman Street Location 1 | Subcontract (Contract 35) | Half-Service Replacement from Curb Stop to Meter | Full-Service Replacement |
| 10/13/20 | Chapman Street Location 2 | Subcontract (Contract 35) | Test Pit | Half-Service Replacement from Curb Stop to Water Main |
| 12/29/20 | Bergen Street Location 1 | Subcontract (Contract 32) | Test Pit | Half-Service Replacement from Curb Stop to Water Main |
| 12/29/20 | Bergen Street Location 2 | Subcontract (Contract 32) | Test Pit | Half-Service Replacement from Curb Stop to Water Main |
| 12/30/20 | Bergen Street Location 3 | Subcontract (Contract 32) | Test Pit | Half-Service Replacement from Curb Stop to Water Main |
| 12/15/20 | Bergen Street Location 4 | Subcontract (Contract 32) | Test Pit | Half-Service Replacement from Curb Stop to Water Main |
| 1/19/21 | Bergen Street Location 5 | Subcontract (Contract 29) | Test Pit | Half-Service Replacement from Curb Stop to Water Main |
| 6/30/21 | Vassar Avenue Location | Prime (Contract 39) | Test Pit | Half-Service Replacement from Curb Stop to Water Main |

30.    SAWYER and SANDERS obtained payment for these sites by taking various steps to conceal their failure to replace lead pipes. These steps included transmitting (a) false or misleading text messages, (b) false or misleading photographs, and (c) misleading verification forms. At times, the Engineering Firm's inspectors relied on photographs of the site transmitted by JAS employees or representations made by JAS employees to verify that the work was properly completed.

31.    For example, the day after SANDERS's crew, at her direction, did not replace all lead pipes at Chapman Street Location 2, SANDERS texted the Engineering Firm inspector, "[address for Chapman Street Location 2] test pit." By describing a certain site only as a "test pit," SANDERS was representing to the inspector that the water service line consisted entirely of copper (i.e., that lead pipes were not present) and thus no work other than a test pit was required. SANDERS also sent the inspector a photograph of the purported test pit at Chapman Street Location 2. That photograph excluded the portion of the water service line containing lead.

32.    The day after her crew did not replace all lead pipes at the Avon Avenue Location, SANDERS texted the inspector, "[address for the Avon Avenue Location] Test Pit," representing that JAS did not find lead at the site and thus only a test pit was required. Contrary to that representation, there was a lead pipe in the water service line.

33.     A review of payment applications submitted by JAS to Newark—as well as those JAS sent to the Construction Company to be used in its payment applications to Newark—shows that for a number of sites where JAS deliberately failed to remove all lead as required, JAS submitted photographs that concealed lead was not replaced. Some photographs depicted narrowly-dug holes at the curb stop, revealing only a short length of pipe that was copper while not revealing the part that was found by law enforcement to be lead in recent excavations. In other photographs, a substantial portion of the pipes was covered in dirt or mud. Other photographs were blurry and low quality, making it impossible to see the remaining lead pipe.

34.     For example, the photographs JAS submitted in support of its payment application for the Avon Avenue Location depicted a very small portion of the water service line that did not match how the water service line looked during recent excavations. For Bergen Street Location 2, the photograph JAS submitted in support of payment showed loose dirt covering the portion of the water service line that indicated the presence of lead.

35.     Some former members of SANDERS's crew stated that, on multiple occasions when Engineering Firm inspectors were not physically present at sites, SANDERS submitted photographs to the inspectors that concealed the fact that lead pipes remained in the ground.

36.     JAS also concealed that it did not replace lead by submitting verification forms that omitted the material fact that, contrary to the terms of the contract, JAS did not remove all lead pipes at each of these locations. For example, JAS submitted

16

verification forms for the Avon Avenue Location and Bergen Street Location 5, thereby conveying that no more work was required because the water service line consisted entirely of copper, with no lead to remove. At the time those verification forms were submitted, SANDERS knew that the verification forms would be submitted in support of payment applications under the contracts to Newark.

37.     JAS worked on the Avon Avenue Location, the N 13th Street Location, and the Vassar Avenue Location (all sites where lead pipes in the water service lines were found in recent excavations) as a Prime pursuant to Contract 39. In seeking payment from Newark for these three sites, SAWYER submitted verification forms directly to the Engineering Firm and Newark that omitted the material fact that, contrary to the terms of the contract, JAS did not remove all lead pipes at each of these locations. Two of these verification forms submitted under Contract 39 (i.e., the Avon Avenue Location and the N 13th Street Location) contained signatures for SANDERS.

38.     Further, in the payment applications for these three addresses under Contract 39 where SANDERS failed to replace all lead pipes, SAWYER falsely represented to Newark that "the work covered by [the] application for payment has been completed in accordance with the contract documents . . . ."

39.     With respect to the remaining sites referenced in paragraph 29, JAS acted as a subcontractor for the Construction Company. In that capacity, SAWYER, SANDERS, and others submitted or caused to be submitted, among other things, various verifications to the Construction Company, including via "Daily Production"

emails, describing the work purportedly performed as required by the contracts at each site. In those verifications, SAWYER, SANDERS, and others indicated that only tes-pits or half-service replacements were performed, thereby conveying to the Contruction Company that no more work was required because the water service line consisted either entirely or partially of copper, and that no lead was left in those water service lines. Those representations were misleading in that they omitted material facts about the work that should have been performed.

Billing for Services Never Rendered

40.    At multiple sites, SAWYER, SANDERS, and Co-Conspirator 1 falsely represented to Engineering Firm inspectors, and ultimately to Newark, that JAS had replaced lead pipes with copper pipes, despite knowing that the entire water service line already consisted of copper prior to JAS's involvement at the site and that JAS did not make the replacements they falsely claimed to have completed.

41.    For example, on or about August 19, 2021, JAS purportedly completed work at a location on Clifton Avenue in Newark (the "Clifton Avenue Location"), pursuant to Contract 39. In or about March 2024, with law enforcement present, Newark excavated the water service line at the Clifton Avenue Location. Law enforcement's examination revealed that although the entire water service line now consists of copper, JAS had only replaced the water service line from the curb stop to the meter (a half-service replacement). The copper pipe from the curb stop to the water main predated JAS's work at the site, where SANDERS served as foreperson.

42.     Nonetheless, records reflect that, on or about December 20, 2021, JAS submitted a payment application to the Engineering Firm that included a fraudulent request for payment for a full-service replacement at the Clifton Avenue Location when JAS should have only billed for a half-service replacement. This payment application included a false verification form containing a signature for SANDERS and a false certification signed by SAWYER.

43.     On or about December 22, 2021, the Engineering Firm transmitted that payment application to Newark and recommended payment by Newark to JAS for a full-service replacement. The Engineering Firm also submitted to Newark JAS's documentation in support of the payment application. On or about January 24, 2022, Newark issued payment to JAS for the payment application containing the Clifton Avenue Location.

44.     Text messages between SAWYER and SANDERS concerning the Clifton Avenue Location showed that SAWYER and SANDERS conspired to fraudulently represent that JAS made a full-service replacement at that location and that SANDERS took affirmative steps to conceal that fraud.

## THE USE OF INTERSTATE WIRE TRANSMISSIONS IN FURTHERANCE OF THE CONSPIRACY TO DEFRAUD

45.     On or about the dates listed below, in Essex County, in the District of New Jersey, and elsewhere, for the purpose of executing and attempting to execute the scheme and artifice to defraud, SAWYER, SANDERS, and others knowingly and intentionally transmitted and caused to be transmitted by means of wire, radio, and

television communication in interstate commerce, certain writings, signs, signals, pictures, and sounds, to include:

| Approximate Date | Description of Interstate Wire Transmission |
|---|---|
| January 7, 2021 | Email, transmitted through a server outside of New Jersey via the Internet, from JAS to the Construction Company submitting a verification form for the Hawthorne Avenue Location, omitting the material fact that all lead pipes were not replaced as required by the governing contract. |
| January 18, 2021 | E-mail, transmitted through a server outside of New Jersey via the Internet, from JAS to the Construction Company stating that JAS replaced the pipes from the curb stop to the meter at the Badger Avenue Location, omitting the material fact that lead pipes were not replaced from the curb stop to the water main as required by the governing contract. |
| April 8, 2021 | Deposit into JAS bank account of a check for approximately $85,494.27 from the Construction Company that included payment for a half-service replacement at the Badger Avenue Location. This transaction involved the use of a server located outside New Jersey. |
| April 21, 2021 | Deposit into JAS bank account of a check for approximately $199,687.12 from the Construction Company that included payment for a test pit at the Hawthorne Avenue Location. This transaction involved the use of a server located outside New Jersey. |
| December 20, 2021 | Email, transmitted through a server outside of New Jersey via the Internet, from JAS to the Engineering Firm attaching its payment application for approximately $1,760.676.24, which included a fraudulent request for JAS to be paid for a full-service replacement at the Clifton Avenue Location. |

In violation of Title 18, United States Code, Section 1349.

## FORFEITURE ALLEGATION

1.      Upon conviction of the offense charged in this Indictment, defendants

**MICHAEL SAWYER and
LATRONIA SANDERS
a/k/a "Tee,"**

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offense charged in Count 1 of this Indictment, and all property traceable thereto.

## SUBSTITUTE ASSETS PROVISION

2.      If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

      (a)      cannot be located upon the exercise of due diligence;

      (b)      has been transferred or sold to, or deposited with, a third person;

      (c)      has been placed beyond the jurisdiction of the Court;

      (d)      has been substantially diminished in value; or

      (e)      has been commingled with other property which cannot be subdivided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

A TRUE BILL,



FOREPERSON

TODD BLANCHE
U.S. Deputy Attorney General

*Alina Habba / RLW*
ALINA HABBA
Acting United States Attorney
Special Attorney

*/s/ Edeli Rivera*
Edeli Rivera
Matthew Specht
Assistant United States Attorneys

23

CASE NUMBER: 25-619 _____

# United States District Court
## District of New Jersey

### UNITED STATES OF AMERICA

v.

### MICHAEL SAWYER and
### LATRONIA SANDERS
### a/k/a "Tee"

## INDICTMENT FOR
### 18 U.S.C. § 1349

A True Bill ████████ ██████████████

Foreperson

████████ **TODD BLANCHE**
UNITED STATES DEPUTY ATTORNEY GENERAL

**ALINA HABBA**
ACTING UNITED STATES ATTORNEY
SPECIAL ATTORNEY

EDELI RIVERA, MATTHEW SPECHT
ASSISTANT U.S. ATTORNEY
NEWARK, NEW JERSEY
973-297-2020